## CONTINENTAL TRUST CO. et al. v. UNITED RYS. & ELECTRIC CO. OF BALTIMORE et al.

### No. 2222.

District Court, D. Maryland.

May 25, 1934.

Charles Markell, of Baltimore, Md., for Consolidated Gas, Electric Light & Power Co.

Joseph C. France, Charles McHenry Howard, and Edgar Allan Poe, Sr., all of Baltimore, Md., for receivers.

WILLIAM C. COLEMAN, District Judge.

There are two questions before the court for determination. First, what is the amount

that the receivers of the United Railways & Electric Company of Baltimore, hereinafter called the railway company, shall pay to the Consolidated Gas, Electric Light & Power Company of Baltimore, hereinafter called the power company, for electrical power and energy furnished the railway company within six months prior to January 5, 1933, which was the date this court placed the railway company in receivership? and, second, What is the amount that the power company may charge the railway company for electrical power and energy furnished it since the commencement of the receivership, and which may hereafter be furnished it during the continuance of the receivership?

As to the first indebtedness, the power company has filed its formal claim alleging priority in the amount of $509,899.65, with interest, on which $20,250 has been paid as the result of two distributions to creditors made by the receivers. The amount claimed to be due since the receivership, and up until April 30, 1934, for which the power company has billed the receivers, and which has been paid, is $1,678,977.77. Both of these billings have been rendered on the basis of 9½ mills per kilowatt hour; the contention of the power company being that, since this is the rate at which the railway company was billed and which it paid regularly since 1930 up until August 1, 1932, and further that since, as is asserted, no complaint was made with respect to these payments until the receivership began, the matter should now be treated as closed on the theory of an account stated, in so far as any right to object to the rate is concerned. On the other hand, the receivers contend that the right to object to the basis on which the bills have been rendered has not been foreclosed to them with respect to either paid or unpaid accounts since 1930 to the present time, because the basis on which payments since 1930 were made was purely tentative and subject to modification. The receivers do not contest the right of the power company to priority in payment of both bills, their objection being directed solely to the amount claimed under these bills. '

It is clear that, as to whatever amount may properly be due for electrical power and energy furnished to the railway company during both of the periods in question, the power company is entitled to priority. On the question as to whether the railway company is precluded from contesting the amount of the bills as rendered, we agree, for the reasons hereinafter given, with the railway company, that it is not so precluded with respect to all unpaid accounts antedating the receivership and all accounts, whether paid or unpaid, since the receivership.

The controversy which gives rise to the present proceeding has been a long and, at times in its later stages, a somewhat acrimonious one, commencing with the making on January 12, 1921, by the power company and the railway company of a formal elaborate agreement for the supplying of electrical power and energy by the one to the other. This document, which is in the nature of a cost plus contract, is so complicated and leaves so much for later calculation, as to invite no end of dispute. Briefly summarized, the history of the dispute is as follows:

For about five years the relations between the two parties under the contract were satisfactory, but thereafter questions arose as to the right of the power company to charge increased rates under the contract, and after extended negotiations a compromise was reached in 1930 whereby all bills for the years 1926 and 1927 were settled on the basis of a flat rate of 9.6 mills per kilowatt hour and 9.5 mills for the years 1928 and 1929, with the understanding that the parties would endeavor to reach an agreement within the year 1930 as to modification of the existing contract in its application to future power service; such agreement to include the rate to be paid for the year 1930. Such agreement, however, was not only not reached in 1930, but has never been reached up to the present time, even though the parties have had frequent negotiations, although, as previously stated, up until August 1, 1932, that is, within approximately six months of the commencement of the receivership, a tentative billing was periodically rendered to the railway company on the basis of 9½ mills, and the same was paid regularly.

As a result of this inability of the officials of both companies, over such a long period of time, to adjust their differences, which would seem to be rather inexcusable under the circumstances and to reflect discredit upon both sides to the controversy, although in its later stages the power company appears to have been more prone to protract the dispute than was the railway company, the receivers inherited the bone of contention, and, after themselves being unsuccessful in arriving at a settlement, although they have been diligent in their efforts, applied for and obtained from this court, on April 20th last, an order authorizing them, pending the determination of the proper amount found to be due by the railway company to the power company with respect to the power and energy furnished both prior to and since the receiv-

ership, to pay a rate of 7 mills per kilowatt hour, instead of the 9½ mills rate which they had been authorized to pay and did pay since the beginning of the receivership, without prejudice to its right to a reduction.

The matter was thus finally brought to a head. The power company has requested that the aforementioned order of this court be rescinded; that the receivers be directed to pay the rate of 9½ mills per kilowatt hour, claiming that that is the legal rate now in effect and that this court has no power to disturb it, and also that the receivers be directed to pay the power company the full amount of its claim as rendered, plus interest, for the period within the six months preceding the receivership.

■ It is necessary at the outset, of course, to dispose of the two questions, which are questions of law, raised by the power company: First, whether the railway company is estopped from denying the correctness of both bills as rendered; and, second, whether this court is without power to determine what rate shall be paid by the railway company other than the rate for which the railway company has been billed, on the theory that such rate is the legal rate on file with the Public Service Commission, and that that body can alone change the rate.

As to the first of these questions, suffice it to say that the evidence satisfies the court that the railway company is not bound by its prior conduct from questioning the basis on which either of the bills is computed. We find that the payments up to August 1, 1932, while tentative in one sense, were intended to be made, and were made, without any such reservations as would justify our permitting them to be reopened at this late time; that is to say, with respect to each period for which payment was actually made, such payment is to be treated as a closed matter. But not so with respect to periods for which bills have not been paid, although rendered upon the same basis as previous bills which were paid. We find from the testimony that it was the intent of both parties in 1930 to do away with the original contract of 1921, in so far as the formula therein provided for ascertaining the rate is concerned. This conclusion is inescapable from the statements made by the officials of the respective companies both in the correspondence which transpired at the time, and in their oral statements made at the hearing in the present proceeding. In 1930 they unquestionably had reached an impasse and had agreed that the only way to overcome it was to have the rate features of the contract superseded by entirely new provisions. Since 1930 the contract has been ignored by both parties in so far as the rate is concerned. The statement of Mr. Wagner, president of the power company, that neither Mr. Storrs, president of the railway company, nor any one else, ever had any intention of going back to the old contract, accurately discloses the actual intent of the parties. The testimony of Mr. Storrs, formerly president and now one of the receivers of the railway company, is substantially to the same effect.

■ In view of the conclusion which the court reaches with respect to the first of the preliminary questions raised by the power company, it necessarily follows that the decision of the court on the second question must also be adverse to the power company. That is to say, we conclude that this court has full power to pass upon and to fix the rate with respect to both periods now in question, because in doing so it is not exercising the function of rate making, which it is conceded it has no power ordinarily to do, but is passing upon a question that is clearly justiciable in this court, namely, the question of what is the proper price on a quantum meruit basis for one of the parties to charge the other for past services, where there is no legally published rate governing the amount to be so charged. The power company contends that, since the contract of January 12, 1921, has been filed with the Public Service Commission of Maryland, such is the legally published rate. This might be true if the contract stated what the rate actually was, but no such statement appears, and the commission has never construed, or been asked to construe, this contract or to fix a rate thereunder. Indeed, the fact that the parties themselves have not been able to determine, after striving for nearly eight years, what the rate under the contract should be, is the best evidence that the contract is not tantamount to a published rate. Furthermore, the contract itself contemplates possible disagreement (article 25), and, while it contains provision for arbitration in the event of such disagreement (article 26), it is fundamental that any such provision in the contract cannot oust a court of its jurisdiction to determine disputes that might be arbitrated if both parties consented.

In saying that the rate features of the contract have been set aside by mutual agreement, we do not mean to say that the contract as a whole has been terminated by the parties, because executory parts of it still survive; for example, the provisions relating to char-

acteristics of energy supply, points of delivery, location of meters, meter calibration, payments, audit of books, annual statements, and so forth.

The rate part of the contract having thus by mutual agreement been set aside and it being within the power of the parties so to do, the court is called upon, as has been explained, to determine the proper amount that one party is entitled to charge the other; and while this is, in a sense, rate making, it is more properly to be defined as determining the fair value of the services rendered in a situation where, by reason of the fact that the rate-making body has never fixed the rate, and the parties themselves have never been able to agree upon the rate, they have appealed to the court to determine the question.

■■ Next, as to the question of burden of proof: Ordinarily, where claims are filed against receivers, the burden of establishing the correctness of such claims would be upon those filing them. However, the present situation is somewhat different, in that the power company has asserted that its claims amount to accounts stated and agreed upon, and that, the railway company having denied that they have this characteristic, the burden is upon the railway company to establish this fact. Assuming, without necessarily deciding, that the burden rests upon the railway company, we reach the conclusion that the unquestioned weight of the credible evidence taken as a whole requires that a reduction be made in the bills as rendered for both periods, and that this reduction should be 2 mills; that is to say, we find that the rate of 9½ mills sought to be exacted by the power company from the railway company is unreasonable to the extent of 2 mills. Since the matter is before the court on a quantum meruit basis, it is entirely proper for the court to consider the three types of evidence which have been introduced: First, evidence of what the power company has allowed its other customers comparable in size and other characteristics. This involves consideration of the power company's so-called T schedule and its contract with the Pennsylvania Railroad Company. Second, evidence of what comparable street railway companies in other places are paying for their power and energy. And, third, evidence of what it would cost the railway company to produce its own power.

Without going into the highly technical details of the various comparative figures which have been introduced with respect to the three aforegoing types of evidence, suffice it to say that we can find no justification for the power company charging the railway company more than 7½ mills per kilowatt hour for power and energy when, as late as 1931, it entered into a formal contract with the Pennsylvania Railroad Company to supply that company, with its requirements distinctly comparable with the requirements of the railway company, and when, as we find, after the provisions of that contract are adjusted as to load and service conditions so as to conform with the requirements of the railway company, the rate per kilowatt hour would only be 7 mills. Similarly, we are led to this conclusion because under the contract by which the Cleveland Street Railway Company buys its power, when adjusted to the requirements of the railway company, the rate under that contract would be only 6.39 mills. Also, it is equally significant to note that the power company's schedule T, which the larger industrial companies in Baltimore are now operating under, would, by the power company's own admission as disclosed by its tabulations placed in evidence, accord to the railway company a rate of 8.406 mills without any special adjustments being made because of the unusually heavy demand of the railway company as well as the permanency and uniformity of this demand, to which, we believe, the railway company would be justly entitled. It is further noteworthy that this rate of 8.406 mills is approximately the same as the figure, namely, 8.40 mills, which the railway company estimates would be the cost to it to erect its own plant and to produce instead of buying its power and energy,—obviously a much less economical thing to do.

The power company insists that the rate accorded to the Pennsylvania Railroad Company is not comparable because that railroad's requirements are predominantly a night "load," and the power company has sought by figures introduced in evidence to show that, if the terms of its contract with the Pennsylvania Railroad Company were properly translated so as to meet the requirements of the railway company, the proper rate would be 11.05 mills. But we find in this computation the inclusion of transmission charges, fixed charges, and operating costs for frequency conversion, as well as power losses because of frequency conversion which we believe to be purely hypothetical and should not have been included. Therefore, we adopt the following figures of the railway company as being more accurate and of more real probative value in fixing the rate to be applied to the railway company in the present proceeding, than the figures of the power company set opposite them:

| | | Suggested Revision |
|---|---|---|
| Average Monthly Billing Demand................... | 31,300 kw. | |
| Kwhr. per year.......................................... | 129,020,756 | Suggested |
| Investment to Receive Power from Generating Station | | Revision |
| Cables from Westport.................................... | $140,000 | $401,800 |
| Changes from Central Substation and Cables......... | 125,000 | 261,600 |
| Cables from Central Substation to Eastern Substa. | 45,000 | 45,000 |
| Two Overhead Wires to Bear Creek.................... | 30,000 | 30,000 |
| | $340,000 | $738,400 |

| | Mills/Kwhr. | |
|---|---|---|
| Demand Charge................................. $434,860 | 3.37 | $434,860 |
| Energy Charge................................... 427,864 | 3.32 | 474,420 |
| Total ........................................ $862,724 | 6.69 | $909,280 |
| Fuel Adjustment to $3.74 Coal................ —2,246 | .01 | —2,246 |
| Total Cost at Gen. Station.................... $860.478 | 6.68 | $907,034 |
| Transmission Charge.................................. | | $178,500 |
| Fixed Charges & Operating Costs of Frequency Conversion .............................................. | | 168,000 |
| Power Losses (7%) of Frequency Conversion......... | | 63,492 |
| Total ............................................ | | $409,992 |
| Cost of Distribution | | |
| Fixed Charges and Operation.............. $ 34,000 | | $ 94,146 (12.75%) |
| Additional Operation........................ 3,000 | | 7,971 |
| Duct Rental................................. 5,000 | | 7,511 |
| Total ...................................... $ 42,000 | 0.32 | $109,628 |
| Total Cost of Power Delivered................ $902,478 | 7.00 | $1,426,654 [1]  11.05 mills/kwhr. |

Similarly, we reject the figures of the power company with respect to the Cleveland contract as also being padded, and believe that the following figures submitted by the railway company are more accurate and of more real probative value than the figures of the power company set opposite them:

Railway Load
Effective billing demand....... 32,240 kw.
Kw.hr. delivered as at present.. 129,020,756 kw.hr.
Kw.hr. delivered to Ry. substations ........................... 125,601,194 kw.hr.
Ry. Investment in Distribution System   $400,000

| Annual Cost of Power with Terms of Cleveland Contract | | Suggested Revision |
|---|---|---|
| Demand Charge.................... $386,879 | | $ 386,879 |
| Energy Charge.................... 367,863 | | 367,863 |
| Total ......................... $754,742 | | $ 754,742 |
| Fuel adjustment to $3.74 coal at Baltimore ....................... $134,536 | | $ 185,411 |
| Total annual Cost at Cleveland rate for 125,601,194 kw.hr. delivered to substations.............. $889,278 | | $ 940,153 |
| per kw.hr.   .   7.08 mills | | |
| Fixed Charges & Operating Costs of Frequency Conversion....... | | $ 168,000 |
| Power Losses (7%) of Frequency Conversion ..................... | | 66,000 |

Annual Cost to Distribute to Ry.
Substations
Carrying charges @ 10%...... $ 40,000
Duct rental or equivalent.... 19,000
Operation and Maintenance.. 6,000
$ 65,000

| Total Annual Cost of Power— 129,020,756 kw.hr. delivered as at present, at Cleveland rates | $824,278 | $1,174,153 |
|---|---|---|
| per kw.hr. | 6.39 mills | 9.10 mills |

It is obvious that the fixing of the price to be paid for electrical power and energy under such circumstances as here presented, involving, as it does, highly technical questions, is necessarily fraught with some speculation in view of the inevitable direct conflict between the figures of the opposing sides. It is impossible to reconcile both sets of figures, and, after all, the truest guide lies not in refinements of mathematical computation, but rather in what the producer has been willing to do and has done under comparable circumstances in the past, and also what other producers under comparable circumstances have been willing to do and have done in the past. On the first of these two questions, the power company's contract with the Pennsyl-

[1] This rate does not include any adjustment for difference in time of energy draft (Pa. R. R. is predominately night load) and for occurrence of peak demand during night hours.

270

vania Railroad Company is clearly most persuasive, and, on the second question, what has been done in Cleveland is at least worthy of much weight, because the mileage of the street railway company in Cleveland is substantially the same as that of the railway company here, it serves a population of the same approximate size, and its problems are largely, although not entirely, identical.

From whatever aspect the evidence in the present case may be viewed, there is no proof that the reduction of 2 mills in the rate as claimed by the power company will not still leave it with a fair return upon its investment. It is significant that Mr. Wagner, president of the power company, testified that under the contract of 1921, the power company intended to get not only 7½ per cent. on its investment, but an additional 10 per cent. on all expenditures resulting from this contract.

As already pointed out, this court is not now sitting as a rate-making body, but merely for the purpose of determining whether a price demanded by one party for past services rendered to another is just and reasonable under the given circumstances. Thus the question of confiscation as applied to public utility rates which, as a matter of fact, could only be determined by taking into account the entire invested capital and business of the producer, is not involved.

In conclusion, it is proper to point out that the court cannot close its eyes to the fact that the rather close affiliation between the managements of the two companies here involved, through the personnel of their directorates and through stockholdings, must have contributed not merely to the long and unfortunate delay which has occurred in the adjustment of the present dispute, but also to an apparent attempt on the part of the power company to exact from the railway company the last mill that it could—an attempt which apparently was not exerted, at least with the same success, with respect to the Pennsylvania Railroad Company, an unaffiliated corporation. In 1921, when the original contract was made, and ever since, the power company has had a very substantial voice in the management of the railway company, and in 1932 five of its own board of directors were also directors of the railway company, whose board had only eleven members. Such things, while not denoting anything inherently wrong or opprobrious, or indeed contrary to common business practice, nevertheless cannot be blinked by a court in dealing with an insolvent company which it is operating in receivership, because it is the court's obvious duty

to reduce, wherever possible, consistent with fairness to all concerned, the expenses of the recceivership. While no one set of comparative figures which have been introduced by the railway company in the present case, dealing with what the power company charged other customers, is to be accepted as conclusive without change, it is at least evidential of what is a reasonable charge under the given circumstances, especially when the figures are supported, as they have been, by the testimony of consulting engineers of the Stone & Webster Corporation, an organization of excellent standing in the public utility field and of a very wide range of experience, which has had no previous connection either with this particular controversy or with the organization or operation of either of the companies that are parties to it. Thus, also, when we find that not only in Cleveland is the rate per kilowatt hour over 3 mills less than the rate here claimed by the power company, but that in such other comparable cities as Cincinnati, Pittsburgh, and New York, the average rate is only 7.05 mills, when the power contracts of the railway companies in those cities are adjusted to the load and conditions of the railway company here, such evidence is not to be lightly discarded.

The total claim of the power company, without allowance for payments on account or interest, from August 1, 1932, to January 5, 1933, on the basis of 9½ mills, is $509,899.65. On the same basis, bills have been rendered and paid for the period from January 6, 1933, to April 30, 1934, amounting to $1,678,977.77. The first item must be reduced by 2 mills, that is, to the basis of 7½ mills, representing a total amount of $402,552.35, or a reduction of $107,347.30 in what is claimed, and, when so reduced, the power company is entitled to priority of payment, less deduction for payments on account. On the second item, namely, the total amount of the bills which have been paid for power and energy since the receivership, the power company will be required to refund to the railway company on the basis of 2 mills, thus reducing the price for that period to the basis of 7½ mills. In other words, on this item the power company shall refund to the railway company the sum of $353,469, and, so long as the railway company, while in receivership shall continue to purchase its power and energy from the power company, it shall, unless otherwise directed by this court, pay for the same the rate of 7½ mills, provided the Public Service Commission of Maryland shall not, during such period, in the exercise of its rate-making power, estab-

lish a different rate to be exacted by the power company.

An order will be signed in accordance with the aforegoing. No interest will be allowed in these adjustments, in view of the circumstances, already discussed, surrounding the differences between the parties which have resulted in the present proceeding.